MIR AIMAL KASI

V.

COMMONWEALTH OF VIRGINIA

Record Nos. 980797 and 980798

November 6, 1998

Present: All the Justices

408

*Elwood Earl Sanders, Jr. (S. Jane Chittom; Richard Goemann*, on briefs), for appellant.

*Donald R. Curry, Senior Assistant Attorney General (Mark L. Earley, Attorney General*, on brief), for appellee.

JUSTICE COMPTON delivered the opinion of the Court.

On Monday, January 25, 1993, near 8:00 a.m., a number of automobiles were stopped in two north-bound, left-turn lanes on Route 123 in Fairfax County at the main entrance to the headquarters of the Central Intelligence Agency (CIA). The vehicle operators had stopped for a red traffic light and were waiting to turn into the entrance.

At the same time, a lone gunman emerged from another vehicle, which he had stopped behind the automobiles. The gunman, armed with an AK-47 assault rifle, proceeded to move among the automobiles firing the weapon into them. Within a few seconds, Frank Darling and Lansing Bennett were killed and Nicholas Starr, Calvin Morgan, and Stephen Williams were wounded by the gunshots. All the victims were CIA employees and were operators of separate automobiles. The gunman, later identified as defendant Mir Aimal Kasi, also known as Mir Aimal Kansi, fled the scene.

At this time, defendant, a native of Pakistan, was residing in an apartment in Reston with a friend, Zahed Mir. Defendant was employed as a driver for a local courier service and was familiar with the area surrounding the CIA entrance.

The day after the shootings, defendant returned to Pakistan. Two days later, Mir reported to the police that defendant was a "missing person."

On February 8, 1993, the police searched Mir's apartment and discovered the weapon used in the shootings as well as other property of defendant. Defendant had purchased the weapon in Fairfax County three days prior to commission of the crimes.

On February 16, 1993, defendant was indicted for the following offenses arising from the events of January 25th: Capital murder of Darling as part of the same act that killed Bennett, Code § 18.2-31(7); murder of Bennett, Code § 18.2-32; malicious woundings of Starr, Morgan, and Williams, Code § 18.2-51; and five charges of using a firearm in commission of the foregoing felonies, Code § 18.2-53.1.

Nearly four and one-half years later, on June 15, 1997, agents of the Federal Bureau of Investigation (FBI) apprehended defendant in a hotel room in Pakistan. Defendant had been travelling in Afghanistan during the entire period, except for brief visits to Pakistan.

On June 17, 1997, defendant was flown from Pakistan to Fairfax County in the custody of FBI agents. During the flight, after signing a written rights waiver form, defendant gave an oral and written confession of the crimes to FBI agent Bradley J. Garrett.

Following 15 pretrial hearings, defendant was tried by a single jury during ten days in November 1997 upon his plea of not guilty to the indictments. The jury found defendant guilty of all charges and, during the second phase of the bifurcated capital proceeding, fixed defendant's punishment at death based upon the vileness predicate of the capital murder sentencing statute, Code § 19.2-264.4.

On February 4, 1998, after three post-trial hearings, during one of which the trial court considered a probation officer's report, the court sentenced defendant to death for the capital murder. Also, the court sentenced defendant to the following punishment in accord with the jury's verdict: For the first-degree murder of Bennett, life imprisonment and a $100,000 fine; for each of the malicious woundings, 20 years' imprisonment and a $100,000 fine; and for the firearms charges, two years in prison for one charge and four years in prison for each of the remaining four charges.

The death sentence is before us for automatic review under former Code § 17-110.1(A) (now § 17.1-313(A)), *see* Rule 5:22, and we have consolidated this review with defendant's appeal of the capital murder conviction. Former Code § 17-110.1(F) (now § 17.1-313(F)). In addition, by order entered April 23, 1998, we certified from the Court of Appeals of Virginia to this Court the record in the noncapital convictions (Record No. 980798). That record consists only of three notices of appeal from the conviction order. No other effort has been made to perfect the noncapital appeals; therefore, those convictions will be affirmed and we shall not address them further.

In the capital murder appeal, we will consider, as required by statute, not only the trial errors enumerated by the defendant but also whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor, and whether the sentence is disproportionate to the penalty imposed in similar cases. Former Code § 17-110.1(C) (now § 17.1-313(C)).

■ At the outset, we will discuss the number, nature, and legitimacy of many issues raised by defendant. He assigned 92 errors allegedly committed by the trial court (placing 91 in his opening brief) and has not argued many of them (Nos. 8, 14, 15, 17, 18, 20, 21, 25, 26, 28, 32, 45, 47, 52, 61, 69, 72, 77, 78, 80, 89, 91 and 92); hence, they are waived and will not be considered. *Jenkins* v. *Commonwealth*, 244 Va. 445, 451, 423 S.E.2d 360, 364 (1992), *cert. denied*, 507 U.S. 1036 (1993).

■ In addition, defendant has effectively presented no meaningful argument in support of many assignments that are actually briefed. We have considered these so-called arguments and find no merit in any of them. *Weeks* v. *Commonwealth*, 248 Va. 460, 465, 450 S.E.2d 379, 383 (1994), *cert. denied*, 516 U.S. 829 (1995). In this category are assignments 2, 5, 16, 19, 22, 23, 24, 29, 30, 33, 43, 51, 54, 73, and 87.

■ Also, other errors alleged (Nos. 6, 39, and 64) raise issues we previously have decided adversely to the argument defendant makes, and those decisions will not be revisited here. Typical of this group is assignment of error 39: "The Circuit Court erred in denying the defendant's motion to declare the Virginia death penalty statute unconstitutional."

■ Finally, from our study of this entire record, including the 4,903-page appendix, we have determined that many assignments of error that are argued in depth are devoid of any merit whatever. These are: Nos. 1, 3, 7, 9, 10, 27, 31, 34, 37, 38, 40, 41, 42, 44, 46,

48, 49, 62, 63, 65, 67, 68, 71, 74, 75, 76, 79, and 88. This group requires no extended analysis and mainly raises issues involving the exercise of discretion by the trial judge on subjects such as continuances, pretrial publicity, discovery, and appointment or disqualification of counsel. Typical of this group is assignment of error 49: "The Circuit Court erred in denying defendant's motions for a continuance filed on August 11, 1997, and October 1, and October 8." We have considered this entire group of alleged errors and reject them without any further discussion.

■ The remaining 23 assignments of error raise issues, *inter alia*, regarding defendant's apprehension, his confession, suppression of evidence, jury selection, and juror conduct. There is no conflict in the evidence relating to any of the facts presented during the guilt phase of this trial; the defendant presented no evidence.

Near 4:00 a.m. on June 15, 1997, Agent Garrett and three other armed FBI agents, dressed in "native clothing," apprehended defendant in a hotel room in Pakistan. Defendant responded to a knock on the room's door and the agents rushed inside. Defendant, who has "a master's degree in English," immediately began screaming in a foreign language and refused to identify himself. After a few minutes, defendant was subdued, handcuffed, and gagged. Garrett identified him through the use of fingerprints. During the scuffle, defendant sustained "minor lacerations" to his arm and back.

When the agents left the hotel with defendant in custody, he was handcuffed and shackled, and a hood had been placed over his head. He was transported in a vehicle for about an hour to board an airplane. During the trip, Garrett told defendant he was an FBI agent.

The ensuing flight lasted "a little over an hour." After the plane landed, defendant was transferred to a vehicle and driven for about 40 minutes to a "holding facility" where he was turned over to Pakistani authorities. The FBI agents removed defendant's handcuffs, shackles, and hood when the group arrived at the holding facility, but the persons in charge of the facility put other handcuffs on him. Defendant was placed in one of the eight cells in the facility, where he remained until the morning of June 17.

During defendant's stay in the facility, the FBI agents never left his presence or allowed him to be interrogated or "harassed." He was allowed to eat, drink, and sleep. On two occasions, the agents removed defendant from his cell to "look at his back and look at his arm" and to take his blood pressure and pulse. The agents did not

interrogate defendant in the holding facility and made certain he was treated "fairly and humanely."

On June 16, "late in the day," Garrett was advised by an official at the U. S. Embassy in Pakistan that defendant would be "released" the next morning. On June 17 near 7:00 a.m., defendant "was allowed to be released" from the facility in the custody of the FBI agents. He was handcuffed, shackled, and hooded during a 15-minute ride to an airplane. Once on the plane, the hood was removed. Shortly after boarding the aircraft, a physician checked defendant's "well being."

During the 12-hour flight to Fairfax County, Garrett first conducted a "background" conversation with defendant, discussing "his life in the United States, where he lived, where he worked." Garrett knew, from his four-and-one-half-year search for defendant, that he was a Pakistani national. Defendant was not a U.S. citizen and he had not returned to the United States after he fled on January 26, 1993.

After the background conversation, Garrett advised defendant of rights according to *Miranda* v. *Arizona*, 384 U.S. 436 (1966). Defendant signed an FBI "Advice of Rights" form, after reading it and having it explained to him. He indicated he was waiving his rights and was willing to give a statement. The subsequent interview lasted about one and one-half hours before defendant signed a written statement summarizing the interview.

In the written statement, defendant confirmed he purchased the AK-47 rifle and about 150 rounds of ammunition several days before the incident in question. He said he drove his pickup truck to the scene, "got out of my vehicle & started shooting into vehicles stopped at a red light." Continuing, he stated that "I shot approximately 10 rounds shooting 5 people. I aimed for the chest area of the people I shot. I then returned to my truck & drove back to my apartment." He also stated that "several days before the shooting I decided to do the shooting at the CIA or the Israeli Embassy but decided to shoot at the CIA because it was easier because CIA officials are not armed."

As part of his oral statement to Garrett, defendant enumerated political reasons "why he wanted to do this shooting." He said he was "upset" because U.S. aircraft had attacked parts of Iraq, he was "upset with the CIA because of their involvement in Muslim countries," and he was concerned with "killing of Pakistanians by U.S. components." When Garrett asked defendant "why he stopped

shooting," he replied "there wasn't anybody else left to shoot." When asked about the gender of those shot, defendant replied "that he only shot males because it would be against his religion to shoot females."

On appeal, defendant mounts several constitutional and other attacks upon the trial court's refusal to suppress and the court's admission in evidence of defendant's statement to Garrett. First, defendant claims the statement was involuntary and was obtained through coercion. We do not agree.

■ The evidence on the issue, presented both at a pretrial suppression hearing and during the guilt phase of the trial, was overwhelming and uncontradicted that defendant validly waived any constitutional rights he may have had in connection with the statement and that the statement was voluntary. No threats or promises were made to defendant, either when he was apprehended or aboard the aircraft, and he was not offered anything in return for his statement. Defendant, who "had good command of the English language," told Garrett that he "understood his rights fully and completely." He never refused to answer any question, and at no time during the 12-hour return flight did he express any fear or indicate he was making a statement because he was afraid. There is no evidence of coercion while he was detained in Pakistan. Indeed, the FBI agents were careful to assure he was treated humanely. The trial court's detailed findings of fact that the waiver was knowing, voluntary, and intelligent and that the statement was voluntary are fully supported by the record. *See Roach* v. *Commonwealth*, 251 Va. 324, 340-41, 468 S.E.2d 98, 108, *cert. denied*, 519 U.S. 951 (1996).

■ Next, defendant, attacking the jurisdiction of the trial court, contends that "either the Extradition Treaty between the United States and Pakistan or the Vienna Convention for Consular Relations were violated" requiring "sanctions" to be imposed for these alleged violations. He argues the "abduction/seizure of Kasi was conducted outside and in express violation of the Extradition Treaty between the United States and Pakistan and without invoking the procedures set out by the laws of each country" and was contrary to law. He says the "sanction" for violation of the treaty should be reversal of the capital murder conviction and "repatriation to Pakistan without prejudice for a new trial."

Continuing, he argues the "record shows that at no time did the Federal agents advise Kasi of his right to consult with a Pakistani diplomat pursuant to Article 36(1) of the Vienna Convention on Con-

sular Relations." He says "that suppression of all statements obtained by virtue of this illegal arrest and abduction in violation of the extradition treaty . . . and the violations of the Vienna Convention is the appropriate alternative sanction to enforce treaty rights violated." We reject the arguments based on the treaty and the "Vienna Convention."

During a pretrial hearing, the Commonwealth's Attorney stipulated that defendant was arrested in Pakistan by an FBI agent; that the agent did not "have any jurisdiction in the nation of Pakistan;" that defendant "was not taken before a judicial officer . . . until he returned to the United States and was presented before this Court"; that "in the course of time from his arrest until he was brought to this country there was no compliance with the Vienna Convention until my letter of July 3rd"; and that "the seizure in Pakistan was not made pursuant to any Pakistani paper or document which would allow him to be seized under the laws of Pakistan." The record shows there "was an unlawful flight warrant issued by a U.S. Magistrate in Alexandria in February of 1993 authorizing Federal agents to arrest Mr. Kansi." Also, the record shows that the July 3 letter mentioned in the stipulation was a letter from the prosecutor formally notifying the defense of defendant's right to seek consular assistance.

The defendant relies upon an Extradition Treaty between the United States and the United Kingdom. 47 Stat. 2122 (1931). Apparently, there is no extradition treaty directly between the United States and Pakistan. But the Attorney General is willing to assume, as represented by the defendant, that the "Islamic Republic of Pakistan has continued in force the treaty promulgated between its former colonial sovereign, the United Kingdom, and the United States," and that it applies to this case.

The defendant focuses on Article 8 of the treaty, which provides:

"The extradition of fugitive criminals under the provisions of this Treaty shall be carried out in the United States and in the territory of His Britannic Majesty respectively, in conformity with the laws regulating extradition for the time being in force in the territory from which the surrender of the fugitive criminal is claimed."

Contrary to defendant's contention, nothing in this treaty can be construed to affirmatively prohibit the forcible abduction of defendant in this case so as to divest the trial court of jurisdiction or

to require that "sanctions" be imposed for an alleged violation of the treaty. The decision on this issue is controlled by *United States* v. *Alvarez-Machain*, 504 U.S. 655 (1992).